# Exhibit A

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT is made and entered into as of this 2nd day of November, 2016 (the "<u>Effective Date</u>") by and between FERRATE TREATMENT TECHNOLOGIES, LLC, a Delaware limited liability company (hereinafter referred to as "<u>Licensor</u>") and PHOSPHORUS FREE WATER SOLUTIONS, LLC, a Delaware limited liability company (hereinafter referred to as "<u>Licensee</u>").

## BACKGROUND

Licensor has developed proprietary methods, materials and processes for ferrate treatment to process and remove phosphorous from bodies of water, and owns pending and issued patents and other Intellectual Property covering, directed to, and/or relating to such methods, materials and processes.

Licensor desires to grant to Licensee, and Licensee desires to obtain from Licensor, an exclusive license to the Licensed Property to develop, manufacture and sell Royalty Products in the Field of Use in the Territory, as more fully described in this Agreement.

For and in consideration of the mutual covenants and the provisions contained in this Agreement, the parties intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms as used in this Agreement have the following meaning:

1.1     "<u>Affiliate</u>" means any corporation, partnership or other business entity which is directly or indirectly controlled by Licensee or Licensor or any entity which directly or indirectly controls or is under common control with Licensee or Licensor. "Control" as used herein means directly or indirectly owns or controls greater than fifty percent (50%) of the voting rights.

1.2     "<u>Applicable Royalty</u>" means:

(a)     with respect to Royalty Products from Project Sites other than Qualified Water Treatment Facilities, an amount equal to (i) 10% of Licensee's gross revenues generated by such Royalty Products prior to the date the Promissory Note and Royalty Advances have been repaid in full to Licensee, and (ii) thereafter during the remainder of the Royalty Term, 6% of Licensee's gross revenues generated by such Royalty Products; and

(b)     with respect to Royalty Products for Project Sites that are Qualified Water Treatment Facilities, the Applicable Royalty depends on the following: (i) if the customer contract is a recurring revenue contract, then the Applicable Royalty will be 6% (or 10%) of Licensee's gross revenues in accordance with Section 1.2(a) above; and (ii) if the customer contract for the Qualified Water Treatment Facility is a capital equipment sale, then the Net Project Margin from the Project Site will be split 60% to the party (Licensor or Licensee) who registers the sales lead, and the remaining 40% of the Net Project Margin will be paid to (or retained by) the other party for the duration of the customer contract, according to the procedures set forth in Section 3.5 of this Agreement.

1



1.3   "Confidential Information" is defined in Section 8.1 of this Agreement.

1.4   "Earned Royalties" is defined in Section 3.2 of this Agreement.

1.5   "Field of Use" means the processing and removal of phosphorous from Project Sites.

1.6   "FTT Software" means all computer programs, source code, object code, data files, information, documentation, and all tangible embodiments thereof, owned, utilized, developed, purchased, or licensed by Licensor and related to the Technology, including without limitation any derivative works, upgrades, error corrections, or similar improvements developed by anyone after the date of this License Agreement. The FTT Software includes, but is not limited to, a "Control Program," which coordinates the Technology's electronic and mechanical components, and a "User/Operator Program," which governs the processes to manufacture the ferrate product and is required to safely operate and maintain the Technology and to improve its operational flexibility and efficiency.

1.7   "Intellectual Property" means U.S. and foreign patents and patent applications, know-how, trade secrets, inventions, discoveries and technical information, including but not limited to information embodied in drawings, designs, mask works, mask work applications, copyrights, copyright applications, derivative works, trademarks and trademark applications, material specifications, processing instructions, formulas, equipment specifications, product specifications, confidential data, computer software, electronic files, research notebooks, invention disclosures, research and development reports and the like related thereto and all amendments, modifications, and improvements to any of the foregoing.

1.8   "Licensed Patents" means the patents described in Section 1.9(a) and 1.9(b) of this Agreement.

1.9   "Licensed Property" means:

(a)   The patent applications and patents owned or controlled by Licensor that are listed on Exhibit A;

(b)   all divisional, continuations-in-part, continuations, reissues, reexaminations and foreign counterparts of the applications included in (a) above;

(c)   all FTT Software and related intellectual property;

(d)   know-how owned or controlled by Licensor that is associated with the use of Ferrate treatment or Ferrators, including without limitation, manufacturing rights, designs and manufacturing information relating to Ferrators; and

(e)   any other Intellectual Property owned, licensed, or under the control of Licensor, that relates to the Technology.

1.10   "Net Project Margin" means net margin on a project as determined in accordance with generally accepted accounting principles ("GAAP") on a basis consistently applied with prior periods adjusted to include deductions for all directly incurred project sales expenses and commissions and Equipment at burdened cost as defined in Section 2.4, and to exclude application

2



of all Earned Royalties otherwise due to Licensor under this Agreement and all general and administrative overheads.

1.11    "Project Site" means all lakes, rivers, and other bodies of surface water and any other phosphorous source points, including without limitation Qualified Water Treatment Facilities.

1.12    "Qualified Water Treatment Facilities" means water treatment facilities where phosphorous removal is the customer's primary purpose.

1.13    "Revenue Contract" means a commercial contract for a full scale commercial phosphorus removal project utilizing Royalty Product in the Field of Use in the Territory.

1.14    "Royalty Product" means any product, equipment, service or project that is (a) covered where made, sold or imported by one or more pending or issued claims under the Licensed Patents that has not been held invalid or unenforceable by a court of competent jurisdiction, or (b) otherwise uses or embodies any of the Licensed Property.

1.15    "Technology" means technology for collecting, filtering and removing phosphorous, which is owned, licensed or controlled by Licensor.

1.16    "Term" is defined in Section 7.1.

1.17    "Territory" means Canada, the United States of America and upon written notice from Licensor that it can be added, Mexico; provided that, if Licensor has not notified Licensee in writing of the addition of Mexico on or before April 30, 2018 then the People's Republic of China will automatically be added to the Territory as of that date.

1.18    "Third Party" means any individual, person or organization, incorporated or unincorporated, other than Licensee and Licensor or their respective Affiliates.

## ARTICLE 2
## LICENSES AND AGREEMENTS

2.1    Exclusive License Grant for Field of Use. Licensor hereby grants to Licensee an exclusive royalty-bearing license to the Licensed Property to develop, make and have made (subject to Section 2.4 below), make derivative works from, use, offer to sell, offer to provide services for, sell, cause to be sold, import, export and provide service arrangements for, the Royalty Products in the Field of Use throughout the Territory. This license may be sub-licensed by Licensee without the prior written consent of Licensor provided each sublicense obligates the sublicensee to assume and abide by all duties, obligations and restrictions of Licensee provided under this Agreement. During the Term, Licensor shall not itself use (except as provided in Section 2.4), or grant any other party, rights to the Licensed Property in the Field of Use in the Territory, and Licensor guarantees that Licensee's rights to the Licensed Property shall be exclusive in the Field of Use in the Territory and no third party will use the Licensed Property in the Field of Use in the Territory.

2.2    Diligence. Following the execution of this Agreement, Licensee will promptly establish or contract for the establishment of the infrastructure (facilities, personnel etc.) necessary

3



to utilize the Licensed Property and the Technology for the removal of phosphorous from a lake or body of water located in the state of Florida acceptable to Licensee (the "Trial Site"). If demonstration of the Licensed Property at the Trial Site proves successful in the discretion of Licensee, then Licensee will use commercially reasonable efforts to commit the full capital and financing necessary to support the expanded use of the Licensed Property and the Technology to develop one or more Royalty Products for sale throughout the Field of Use in the Territory.

2.3   Other Agreements. Licensor hereby assigns to Licensee all of Licensor's rights and obligations under the contracts listed on Exhibit B, (the "Transferred Contracts"), and Licensee hereby assumes all rights and obligations under the Transferred Contracts as of the Effective Date.

2.4   Equipment; License to Manufacture.

(a)   During the Term, Licensor will have the exclusive right to make or have made 100% of Licensee's needs for Ferrators and related components described on Exhibit C (the "Equipment") for Licensee in the Field of Use in the Territory, except as provided in (b) and (c) below. Licensor will arrange for the manufacturing and supply to Licensee of all such Equipment as ordered by Licensee from time to time. Until the date Licensee becomes profitable on a current annualized basis under GAAP, Licensee will pay Licensor an amount equal to Licensor's demonstrable costs of such Equipment (including documented direct Licensor assembly labor at a rate of 1.2 times actual labor cost as and for direct labor and indirect overhead cost allocations). After such date, Licensee will pay Licensor demonstrable costs of such Equipment (including documented direct Licensor assembly labor at a rate of 1.2 times actual labor cost as and for direct labor and indirect overhead cost allocations) plus a net profit margin of 10% for the Equipment. Licensor and Licensee will collaborate in good faith on cost reduction initiatives and any resulting cost savings will be passed on to Licensee.

(b)   In the event that Licensor is unable or unwilling or fails to supply 100% of Licensee's purchase order demand for two (2) consecutive months within agreed lead times and pursuant to standard commercial terms, or if Licensee receives Equipment that does not meet specification or if a case is filed by or against Licensor under bankruptcy law (hereinafter referred to as a "Failure to Supply"), then Licensee shall be permitted (with no obligation or liability to Licensor) to obtain the Equipment from another supplier. Upon the occurrence of any such Failure to Supply and through and until such time as Licensor fully resumes its supply obligations hereunder: (i) Licensor shall make available to Licensee or its designee access to that the Licensed Property and any other technical and proprietary materials, information and techniques necessary for Licensee to procure required raw materials or produce or arrange an alternative supplier of Equipment; (ii) Licensor shall provide advice and consultation in connection therewith; (iii) Licensee shall have no obligation to purchase Equipment from Licensor until any contractual obligations that Licensee has assumed in connection with producing the same or obtaining such substitute source of supply shall have terminated (provided that Licensee will commit to returning to Licensee for supply within 12 months of Licensor satisfying Licensee that Licensor is able to supply in accordance with this Agreement Notwithstanding anything to the contrary contained in this Agreement, in the event that Licensee shall make or have made the Equipment pursuant to this Section 2.4, Licensee shall be permitted, upon written notice to and consent of Licensor (which consent shall not be unreasonably withheld,



delayed or conditioned), to disclose to any third party any Confidential Information as is reasonably necessary in connection with such activities.

(c)     All rights and licenses to Licensed Property granted under this Agreement by Licensor to Licensee are, for all purposes of Section 365(n) of Title 11 of the United States Code ("Title 11"), licenses of rights to intellectual property as defined in Title 11. Licensor agrees during the Term of this Agreement to create and maintain current copies or, if not amenable to copying, detailed descriptions or other appropriate embodiments, of all such Licensed Property which is subject to the license granted in Sections 2.1 and 2.4(b). If a case is commenced by or against Licensor under Title 11, then, unless and until this Agreement is rejected as provided in Title 11, Licensor (in any capacity, including debtor-in-possession) and its successors and assigns (including, without limitation, a Title 11 trustee) shall either perform all of the obligations provided in this Agreement to be performed by Licensor or provide to Licensee copies of such embodiments of such Licensed Property held by Licensor and such successors and assigns, as Licensee may elect in a written request, immediately upon such request in order for Licensee to continue to exercise its rights as licensee under the Licensed Property subject to and in accordance with the terms of this Agreement. All rights, powers and remedies of Licensee, as a licensee hereunder, provided herein are in addition to and not in substitution for any and all other rights, powers and remedies now or hereafter existing at law or in equity (including, without limitation, Title 11) in the event of the commencement of a Title 11 case by or against Licensor. Licensee, in addition to the rights, powers and remedies expressly provided herein, shall be entitled to exercise all other such rights and powers and resort to all other such remedies as may now or hereafter exist at law or in equity (including Title 11) in such event.

2.5     <u>Right of First Offer</u>. Licensor shall not consummate a sale or enter into a license with any other person or entity for sale, license or use of the Licensed Property in the Field of Use outside the Territory without providing prior notice and a 30-day opportunity to Licensee to acquire such rights on mutually agreeable terms and conditions.

2.6     <u>Services Agreement</u>. As a condition to the execution of this Licensee Agreement, Licensor and Licensee are executing the Services Agreement in the form attached as <u>Exhibit D</u>.

## ARTICLE 3
## PAYMENTS

3.1     <u>Payments</u>. In consideration of the rights granted to Licensee under this agreement, Licensee will pay to Licensor:

(a)     the Earned Royalties described in Section 3.2;

(b)     Subject to execution and delivery of a personal guaranty from Luke Daly that is in the form attached as <u>Exhibit E</u>, Licensee will advance $2,000,000 to Licensor under the terms of the Promissory Note dated July 28, 2016 a copy of which is attached as <u>Exhibit F</u>; and

(c)     Licensee will advance $500,000 of Earned Royalties to Licensor within five (5) business days of Licensee's receipt of revenue under a Revenue Contract after successfully demonstrating the efficacy of the Technology at the Trial Site and obtaining a Revenue Contract.



5

3.2     Earned Royalties.  Commencing upon Licensee's receipt of revenues from its first commercial sale of a Royalty Product in the Field of Use in the Territory, and continuing throughout the Term (as defined in Section 7.1), Licensee will pay to Licensor, earned royalties equal to the Applicable Royalty on Licensee's gross revenues from Royalty Products by Licensee and its Affiliates and any permitted sublicensees ("Earned Royalties").  Only a single Earned Royalty will be paid on each dollar of revenue from a Royalty Product regardless of the number of Licensed Patents that may cover the Royalty Product.  All Earned Royalties will be paid within thirty (30) days after the end of each calendar quarter in arrears, unless otherwise specifically provided herein.  Each payment will be accompanied by the sales report described in Section 3.3.

3.3     Reports; Records; Audits.

(a)     Following the first commercial sale of a Royalty Product in the Field of Use, Licensee will provide Licensor with quarterly sales reports, which will include information describing the Royalty Product sold, gross revenues, Earned Royalties payable, and the method used to calculate such Earned Royalties.  During the period that Earned Royalties are payable, and for a period of two (2) years thereafter, Licensee will keep, and will cause its Affiliates and sublicensees to keep, complete and accurate records pertaining to the sales of the Royalty Products by itself, its Affiliates and their respective sublicensees in sufficient detail to permit Licensor, through independent auditors as described herein, to confirm the accuracy of all payments due hereunder.  Licensor will have the right to cause an independent, certified public accountant reasonably acceptable to Licensee to audit such records to confirm such gross revenues and Earned Royalties for a period covering not more than the preceding two (2) years.  Such audits may be exercised during normal business hours upon reasonable prior written notice to Licensee, and subject to an appropriate confidentiality agreement.  All records disclosed to those accountants will be deemed to be Confidential Information under this Agreement.  Licensor will pay the full cost of any such audit.  Any period audited pursuant to this Section 3.3 may be audited only once.

(b)     Licensee will provide Licensor access to, and copies of all research, data and technical and commercial information related to the use of the Licensed Property in Field of Use. All information disclosed will be Confidential Information under this Agreement.

3.4     Advancement of Royalties.  If Earned Royalties are advanced to Licensor under Section 3.1(c) of this Agreement, then any Earned Royalties accrued after the date of such advance will first be applied to recoup the advanced amount before Earned Royalties are paid to or credited against any amounts owing under the Promissory Note and then directly to Licensor.

3.5     Qualified Water Treatment Facilities.  If either Licensor or Licensee intends to propose a sale of a Royalty Product to a water treatment facility, that party must notify the other and follow the procedures set forth in Exhibit G to this Agreement.  All contracts with Qualified Water Treatment Facilities in the Field of Use in the Territory must be executed between Licensee (in its discretion) and the customer.  If there is a dispute as to whether phosphorous removal is the primary purpose, and therefore whether the sales lead is a Qualified Water Treatment Facility, Licensor and Licensee will follow the dispute mechanism on Exhibit G.

**ARTICLE 4**
**INTELLECTUAL PROPERTY**

4.1     Ownership of Intellectual Property Inventions.

(a)     Any Intellectual Property that is discovered, invented, developed, made, conceived, authored or otherwise created by or on behalf of Licensee during the Term of this Agreement and that does not relate to the production, delivery, use, or application of ferrate or ferrate feedstocks shall be the exclusive property of Licensee.

(b)     Any Intellectual Property that is discovered, invented, developed, made, conceived, authored or otherwise created by or on behalf of Licensee during the Term of this Agreement and that relates to the production, delivery, use, or application of ferrate or ferrate feedstocks shall be the exclusive property of Licensor.  Licensee hereby assigns its rights under any such Intellectual Property to Licensor, subject to the following:

(1) For any Intellectual Property described in 4.1(b) that has a recognized application in the Field of Use, Licensor hereby grants to Licensee a perpetual, fully-paid up and sub-licensable license to such Intellectual Property in the Field of Use in the Territory. Licensor shall not practice such Intellectual Property in the Territory and Licensor shall pay Licensee a royalty equal to 6% of Licensor's gross revenues generated by the practice of such Intellectual Property outside the Territory.

(2) For Intellectual Property described in 4.1(b) that has no recognized application in the Field of Use, Licensor hereby grants Licensee a first option to negotiate, in good faith, a license to such Intellectual Property in the Territory.  Licensor shall pay Licensee a royalty, which unless otherwise agreed in writing, will equal 6% of Licensor's gross revenues generated by the practice of such Intellectual Property.  To the extent Licensor becomes obligated to make royalty payments to Licensee under this Section 4.1, then Licensor shall have the same quarterly reporting and payment obligations as applicable to Licensee under Sections 3.2 and 3.3 of this Agreement.

4.2     Patent Prosecution and Costs.

(a)     Following the Effective Date, Licensor will be responsible for the preparation, filing, prosecution, issuance and maintenance of the Licensed Patents, including choice of patent counsel.  Licensor shall diligently prosecute and maintain the United States and international patent applications and patents included in the Licensed Patents.  With regard to the Licensed Patents, Licensor shall keep Licensee informed of patent prosecution, will consult in good faith and consider Licensee's comments and suggestions prior to any filings or other actions before or communications with the U.S. Patent and Trademark Office and any international office, for the same, and shall promptly provide Licensee with copies of all relevant documentation, notices and communications (written or oral) with those officials so that Licensee may be informed and apprised of the continuing prosecution.

(b)     Licensor will cover all documented, reasonable and necessary out-of-pocket expenses (including attorney fees and application fees) for the preparation, filing, maintenance, prosecution, and issuance of Licensed Patents and maintenance fees ("Patent Costs") incurred after the Effective Date, including all patent office fees and outside patent counsel costs in the United States and applicable foreign jurisdictions for Licensed Patents.  Licensor will provide Licensee evidence of payment of the Patent Costs as incurred.

(c)     Licensor's obligation to pay the Patent Costs described in this Section shall continue during the Term.  If Licensor fails to continue prosecution and/or maintenance of such application(s) or patent(s) and Licensee assumes the prosecution and/or maintenance of an

7



application or patent, then Licensee may deduct the Patent Costs paid by Licensee from any Earned Royalties that are otherwise due to Licensor.

4.3     Third Party Contested Matters.  Each of Licensor and Licensee will promptly notify the other in writing of any allegation by a Third Party that the activity of Licensee pursuant to this Agreement infringes any intellectual property rights of a Third Party.  Licensor will have the first right, but not the obligation, to control any defense of any such claim involving alleged infringement of Third Party rights at its own expense and by counsel of its own choice.  If Licensor does not elect to control the defense within fourteen (14) business days of receipt of notification from Licensee of the alleged infringement, then Licensee shall have the option to control the defense and to deduct the costs (including, without limitation, attorney fees and costs) from any Earned Royalties that are otherwise due to Licensor.  Neither party shall settle or compromise any litigation involving patent rights controlled by the other party without the written consent of the other party.

4.4     Enforcement.  Each party shall promptly report in writing to the other party during the Term of this Agreement any (a) known or suspected infringement of Licensed Patents in the Territory or (b) known or suspected unauthorized use or misappropriation of Licensed Patents in the Territory, of which such party becomes aware.  The notifying party shall provide the other party with all available evidence supporting such infringement, suspected infringement, unauthorized use or misappropriation.  Licensor will have the first right, but not the obligation, to control the enforcement with respect to any such infringement or misappropriation at its own expense and by counsel of its own choice.  If Licensor does not elect to control the enforcement within fourteen (14) business days of receipt of notification from Licensee, then Licensee shall have the option to control the enforcement and to deduct the costs (including, without limitation, attorney fees and costs) from any Earned Royalties that are otherwise due to Licensor.  Each party will reasonably cooperate with the other in any action for such enforcement including but not limited agreeing to be named as a necessary party in any litigation for enforcement.  Neither party shall settle or compromise any litigation for such enforcement without the written consent of the other party.

4.5     Patent Invalidity Claim.  If a Third Party asserts that any claim of a Licensed Patent is invalid or otherwise unenforceable (an "Invalidity Claim"), whether as a defense in an infringement action brought pursuant to Section 4.4, in a declaratory judgment action, in a reexamination, inter partes review, post-grant review, covered business method review, or opposition in any patent office proceeding or other administrative proceeding, or in a Third Party Infringement Claim brought against Licensor or Licensee, the parties shall cooperate with each other in preparing and formulating a response to such Invalidity Claim.  If Licensee defends an Invalidity Claim, Licensee may deduct the costs (including without limitation, attorney fees and costs) from any Earned Royalties that are otherwise due to Licensor.  Neither party will settle or compromise any Invalidity Claim involving the Licensed Patents in the Field of Use in the Territory without the prior written consent of the other.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

5.1     Licensor's Representations and Warranties.  Licensor represents and warrants to Licensee that:



(a)     Licensor is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has full corporate power to conduct the business in which it is presently engaged and to enter into and perform its obligations under this Agreement.

(b)     This Agreement constitutes the valid and legally binding agreement of Licensor, enforceable against Licensor in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c)     The execution and performance of this Agreement do not violate the terms of any contract or agreement to which Licensor is a party or by which Licensor or any of its assets is bound.

(d)     Exhibit A sets forth a complete listing and description of the Licensed Property. Licensor is the sole and exclusive owner of the Licensed Property and has the right to license the Licensed Property to Licensee pursuant to this Agreement.  All current and former employees, consultants and contractors of Licensor that have participated in the creation or development of any Licensed Property have executed valid and enforceable agreements, pursuant to which they have assigned or otherwise vested all of their rights in and to any such Licensed Property to Licensor and have agreed to maintain the confidentiality of such Licensed Property.

(e)     There are no royalties, fees, honoraria or other payments payable by Licensor to any person by reason of the ownership, development, modification, use, license, sublicense, sale, distribution or other disposition of the Licensed Property in the Territory, other than on-going maintenance fees.  All filing fees, issue fees, and other similar fees and charges applicable to the Licensed Property, including the Licensed Patents in the Territory, that are owing, accrued or incurred on or before the Effective Date have been paid, or will be paid from the Advanced Royalties of $1,750,000 due Licensor at closing.

(f)     To the best knowledge of Licensor, all issued patents included within the Licensed Patents are valid and enforceable and no claim, action, suit or proceeding has been threatened, brought or is pending alleging the infringement or challenging the validity or enforceability of the Licensed Patents.

(g)     No activity of any person in the Territory conflicts with, infringes upon or otherwise misappropriates any Licensed Property.

(h)     Licensor will provide to Licensee complete and up-to-date copies of all FTT Software, including all computer programs, source code, object code, data files, information, and documentation, and no other software is necessary for the operation of the Technology, required to operate and at the time each Ferrator is purchased, or as defined in Section 2.4 (b) above, to make or have made Ferrator units and ancillary equipment if the Licensor Fails to Supply Licensee's needs.

(i)     Except as set forth in the Transferred Contracts, Licensor has not granted any licenses, sublicenses or other rights in or with respect to the Licensed Property in the Territory to any Third Party.



(j)     Licensor has taken reasonable measures to maintain in confidence all know-how, and to protect the secrecy, confidentiality and value of any trade secrets included in the Licensed Property.

(k)     <u>Exhibit B</u> sets forth a true, accurate and complete copies of all of Transferred Contracts, including all amendments and supplements thereto, have been made available to Licensee.  Each Transferred Contract is valid, binding and in full force and effect and is enforceable by Licensor in accordance with its terms, subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles.  Licensor has performed all obligations required to be performed by it to date under each Transferred Contract, and Licensor is not in material breach or default thereunder and, to the knowledge of Licensor, no other party to such Transferred Contract is in breach or default thereunder.

(l)     To the knowledge of Licensor, no facts or conditions exist which could reasonably be expected to prevent Licensee from obtaining a Revenue Contract.

5.2     <u>Licensee's Representations and Warranties</u>.  Licensee represents and warrants to Licensor that:

(a)     Licensee is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has full corporate power to conduct the business in which it is presently engaged and to enter into and perform its obligations under this Agreement.

(b)     This Agreement constitutes the valid and legally binding agreement of Licensee, enforceable against Licensee in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c)     The execution and performance of this Agreement do not violate the terms of any contract or agreement to which Licensee is a party or by which Licensee or any of its assets is bound.

(d)     Licensee has the financial resources available for the performance of this Agreement, including the payments under Article 3 of this Agreement and other budgeted items listed in the Final NEWCO pro-forma projections dated August 12, 2016 and utilized in investment solicitation proposals and presentations (the "<u>Projections</u>"), subject to achievement of revenues and profitability no less than represented in the Projections.

## ARTICLE 6
## INDEMNIFICATION

6.1     <u>Licensee Indemnity</u>.  Licensee shall indemnify, defend and hold harmless Licensor and its officers, directors, employees and agents from and against all claims, demands, liabilities, damages and expenses (including reasonable attorneys' fees) arising from or related to Licensee's exercise of the licenses granted to Licensee in this Agreement, to the extent arising out of (a) Licensee's breach of any representation or warranty covenant or agreement under this Agreement or (b) any negligent act or omission of Licensee under this Agreement.



6.2     Licensor Indemnity.  Licensor shall indemnify, defend and hold harmless Licensee and its officers, directors, employees and agents from and against all claims, demands, liabilities, damages and expenses (including reasonable attorneys' fees) to the extent arising out of (a) Licensor's breach of any representation or warranty, covenant or agreement under this Agreement or (b) any negligent act or omission of Licensor under this Agreement.

6.3     Right of Set Off  To the extent that Licensor has an indemnification obligation pursuant to this Article 6, Licensee may set off the amount of such indemnification against any amounts then due and unpaid to Licensor by Licensee within the time period allowed for payment to Licensor.

## ARTICLE 7
## TERM AND TERMINATION

7.1     Term.  Unless sooner terminated as otherwise provided in this Agreement, the term of this Agreement will commence on the Effective Date and remain in effect for twenty (20) years, and will automatically renew thereafter for one-year renewal terms unless Licensee provides at least 6-months' notice of non-renewal (the "Term").

7.2     Termination by Licensor.  Licensor shall have the right to terminate this Agreement upon the occurrence of any one or more of the following events:

(a)     failure of Licensee to make any undisputed payment required pursuant to this Agreement, including Applicable Royalties, which is not cured within 30 days of written notice from Licensor;

(b)     the insolvency of Licensee, institution of any proceeding by Licensee under any bankruptcy, insolvency, or moratorium law or any assignment by Licensee of substantially all of its assets for the benefit of creditors or the placement of Licensee's assets in the hands of a trustee or a receiver unless the receivership or trust is dissolved within thirty (30) days thereafter; or

(c)     the breach of any material term of this Agreement, including without limitation, Section 2.2, by Licensee that remains uncured thirty (30) days after written notice from Licensor.

7.3     Termination by Licensee.  Licensee may terminate this Agreement:

(a)     upon thirty (30 days written notice to Licensor if the Trial Site project is unsuccessful or if Licensee is unable to timely obtain a Revenue Contract;

(b)     without cause upon ninety (90) days written notice to Licensor if i) Licensee provides notice that it has permanently discontinued use of the Licensed Property in the Field of Use or ii) if Licensee has not used the Licensed Property in the Field of Use for a period of 12 months;

(c)     upon written notice to Licensor if there is a breach of a material term of this Agreement by Licensor remains uncured thirty (30) days after written notice from Licensee; or

(d)     upon written notice to Licensor if a determination by the U.S. Patent Office about a Licensed Patent, or a judicial or administrative determination or change of applicable law would

11



adversely affect, or reasonably be expected to adversely affect, Licensee's exclusive use and exploitation of the Technology in the Territory.

7.4     Survival. The provisions of Articles 4, 5, 6 and 8, and Sections 7.4 and 7.5, of this Agreement shall remain in full force and effect notwithstanding the termination of this Agreement.

7.5     Effect of Termination.

(a)     Upon termination of this Agreement for any reason, all license rights granted hereunder shall return to Licensor, with Licensee retaining no such rights and further agreeing to stop all future use of the Licensed Property, provided that Licensee shall be allowed to continue performing under existing Revenue Contracts that use the Licensed Property only if Licensee continues to pay Earned Royalties to Licensor as defined in Section 3.2 above.

(b)     Each party will, within thirty (30) days following the effective date of termination, deliver to the other party any and all Confidential Information of the other party, in any form, including any copies and extracts thereof, in its possession, provided that the delivering party will be entitled to retain one set of all such information for the sole purpose of monitoring such party's obligations hereunder or to permit such party to satisfy any continuing legal or regulatory obligations or requirements.

(c)     Except as otherwise stated in this Agreement, expiration or termination of this Agreement will not relieve (i) the parties of any obligation accruing prior to such expiration or termination, including without limitation payments of Earned Royalties on sales of Royalty Products occurring prior to the date of termination; or (ii) any obligation of Licensor to pay royalties under Section 4.1(b) of this Agreement.

## ARTICLE 8
## CONFIDENTIALITY / PUBLICITY

8.1     Confidentiality.  Except as authorized under Section 8.2 (Publicity), each party agrees not to disclose or use any Confidential Information of the other party except as permitted or required for performance by the party receiving such Confidential Information of its rights or duties hereunder.  "Confidential Information" means information disclosed in writing by one party to the other party pursuant to this Agreement and designated in writing as "Confidential" or if disclosed verbally confirmed in writing within fifteen (15) days thereof with the written designation "Confidential", but Confidential Information does not include any information, or documents or materials containing only information that: i) is or becomes publicly known without fault of the recipient, ii) is or become lawfully available from another source, or iii) was known to the recipient before receipt from the disclosing party, or iv) is independently developed by the recipient as evidenced by contemporaneous written documentation, or v) is required by law or regulation to be disclosed, provided that the recipient uses reasonable efforts to notify the disclosing party to provide an opportunity to restrict its disclosure and to obtain confidential treatment.

8.2     Publicity about the Existence of the Agreement. If a party desires to issue a press release or other public statement concerning the execution or existence of this Agreement, it must first obtain the written approval of the other party of the content of such proposed release or statement, which shall not be unreasonably withheld or delayed.  Once content is approved, no



further approval is needed for dissemination of the same press release or public statement so long as such dissemination is independent in timing and content from any other content. Notwithstanding, each party specifically authorizes the other party to (a) disclose the existence and general nature of this Agreement (which shall not disclose financial information unless under confidentiality agreement no less restrictive than the Confidentiality Agreement) to its shareholders, existing lenders, counsel, accountants, bankers, agents, regulatory personnel and potential investors, and (b) include the Licensor name and logo (in form and quality supplied by Licensor) or the Licensee name and logo (in form and quality supplied by Licensee), as the case may be, in materials presented to such persons and entities. In all other respects, except as required by law or as set forth in this Agreement, neither party may use any trademarks, logos, nor symbols associated with the other party without the prior written permission of such other party.

## ARTICLE 9
## ASSIGNMENT

9.1 <u>Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and the successors or assigns of the parties hereto. Licensee shall not assign this Agreement without the prior written consent of Licensor, which will not be unreasonably withheld or delayed, except to an Affiliate of Licensee or to a successor in interest to the business or assets of Licensee relating to the Technology (whether by asset sale, stock sale, merger or otherwise). This Agreement may not be assigned by Licensor without the prior written consent of Licensee.

## ARTICLE 10
## NOTICES

10.1 All notices and other communications shall be hand delivered, sent by private overnight mail service, or sent by registered or certified U.S. mail, postage prepaid, return receipt requested, and addressed to the party to receive such notice or other communication at the address given below, or such other address as may hereafter be designated by notice in writing:

If to Licensor:     Ferrate Treatment Technologies, LLC
                         Attn: Luke Daly, President
                         230 Sunport Lane, Suite 450
                         Orlando, Florida 32809
                         Email: ceo@ferrate.biz

If to Licensee:     Phosphorous Free Water Solutions, LLC
                         c/o Tim McIntee
                         Email: tmcintee@phosphorusfree.com

with a copy to:     Lindquist & Vennum LLP
                         Attn: Kevin Costley
                         4200 IDS Center, 80 South 8th Street
                         Minneapolis, MN 55402
                         Email: kcostley@lindquist.com

Such notices or other communications shall be effective upon receipt by an employee, agent or representative of the receiving party authorized to receive notices or other communications sent or delivered in the manner set forth above.

13



## ARTICLE 11
## MISCELLANEOUS

11.1    <u>Legal Compliance</u>. Each of the parties shall comply with all laws and regulations relating to its manufacture, processing, producing, use, selling, or distributing of Royalty Products.

11.2    <u>No Other Licenses/IP Maintenance, Prosecution.</u>    Only the licenses granted pursuant to the express terms of this Agreement shall be of any legal force and effect as between Licensor and Licensee with respect to the subject matter of this Agreement.  No license rights are created by implication or estoppel.  In addition, except as expressly stated in this Agreement, nothing shall be construed as requiring Licensee or Licensor to file or maintain any patent application, to secure any patent or to maintain any patent in force, or as requiring Licensor or Licensee to bring or prosecute actions or suits against third parties for infringement, or as conferring any right to use, in advertising, publicity or otherwise, any name, trade name or trademark, or any contraction, abbreviation, or simulation thereof.

11.3    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between Licensor and Licensee with respect to the subject matter hereof and supersedes all other agreements, whether oral or written.

11.4    <u>Amendment, Waiver, Discharge, etc</u>.  This Agreement may not be amended or modified in any manner, except by an instrument in writing signed on behalf of each of the parties to this Agreement by their duly authorized representatives.  The failure of either party to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part of it or the right of either party after any such failure to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

11.5    <u>Severability</u>.  If any provision of this Agreement is held invalid by a court of competent jurisdiction, such provision shall be enforced to the maximum extent permissible and the remaining provisions shall nonetheless be enforceable according to their terms.

11.6    <u>Force Majeure</u>.  Neither party shall be in default because of any failure to perform this Agreement if such failure arises from causes beyond the control of such party ("the first party") and without the fault or negligence of such first party, including without limitation, Acts of God or of the public enemy, acts of the Government, fires, floods, earthquakes, epidemics, quarantine restrictions, strikes, or freight embargoes.  In each instance, the failure to perform must be beyond the reasonable control and without the fault or negligence of the first party.  If it appears that performance under this Agreement may be delayed by an event of Force Majeure, the first party will immediately notify the other party as soon as practicable in writing at the address specified in this Agreement.  During the period that the performance by one of the parties of its obligations under this Agreement has been suspended by reason of an event of Force Majeure, the other party may likewise suspend the performance of all or part of its obligations hereunder to the extent that such suspension is commercially reasonable.

11.7    <u>Governing Law and Dispute Resolution</u>.



IN WITNESS WHEREOF, each of Licensor and Licensee has caused this Agreement to be signed by its duly authorized representative as of the Effective Date.

FERRATE TREATMENT TECHNOLOGIES
LLC

By: _Luke J. Daly_____

Name: _Luke J. Daly_____

Title: _CEO_____

Date: _11. 2. 2016_____

PHOSPHOROUS FREE WATER
SOLUTIONS, LLC

By: _Timothy S. McIntyre_____

Name: _Timothy S. McIntyre_____

Title: _President_____

Date: _11 2 2016_____

Exhibits

Exhibit A – Licensed Patents
Exhibit B – Transferred Contracts
Exhibit C – Equipment
Exhibit D – Services Agreement
Exhibit E – Guaranty
Exhibit F – Promissory Note
Exhibit G – Qualified Water Treatment Facilities

*[Signature page to License Agreement]*

16

11.7.1  This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of Minnesota, without giving effect to principles of conflicts of laws.

11.7.2  Each of the parties will attempt in good faith to amicably and promptly resolve any dispute arising out of or relating to this Agreement through discussions between senior representatives who have authority to settle the controversy.  These senior representatives shall be an officer of Licensor and Licensee.  If Licensor and Licensee are unable to resolve a dispute within thirty (30) days after commencing such discussions, the parties shall be entitled to resort to litigation of such matters. Any action brought to enforce any provision of this Agreement shall be brought in a court of competent jurisdiction sitting in the City of Minneapolis, Minnesota and the parties hereto hereby consent to the jurisdiction of such courts.

11.8  <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each party and delivered to the other party.

11.9  <u>Titles and Headings; Construction</u>.  The titles and headings to Articles and Sections herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.  This Agreement shall be construed without regard to any presumption or other rule requiring construction hereof against the party causing this Agreement to be drafted.

11.10  <u>Benefit</u>.  Nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties to this Agreement or their respective successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

11.11  <u>Right to Seek Injunctive Relief</u>.  Each party agrees that any material breach of this Agreement by a party may cause substantial and irrevocable damage to the other party and therefore, in the event of any such breach, in addition to such other remedies that may be available, the other party shall have the right to seek specific performance and injunctive relief.

[Signatures on next page.]



CONFIDENTIAL

# EXHIBIT A

## Licensed Property

**US PATENTS**

| Title of Invention: | Filing Date: | Application No. | Issue Date: | Patent No: |
|---|---|---|---|---|
| METHODS OF SYNTHESIZING AN OXIDANT AND APPLICATIONS THEREOF | 1/14/02 | 10/047460 | 9/14/04 | 6790429 |
| METHODS OF SYNTHESIZING AN OXIDANT AND APPLICATIONS THEREOF | 9/17/02 | 10/246575 | 12/13/05 | 6974562 |
| METHODS OF SYNTHESIZING A FERRATE OXIDANT AND ITS USE IN BALLAST WATER | 11/24/04 | 10/997333 | 1/13/09 | 7476324 |
| METHODS OF SYNTHESIZING AN OXIDANT AND APPLICATIONS THEREOF | 1/12/09 | 12/352405 | 10/26/10 | 7820025 |
| METHODS AND DEVICES FOR MEASURING THE CONCENTRATION OF AN ADDITIVE | 6/13/13 | 13/994088 | 5/6/14 | 8715510 |

**US APPLICATIONS**

| Title of Invention: | Filing Date: | Application No. | Issue Date: | Patent No: |
|---|---|---|---|---|
| METHODS OF SYNTHESIZING AN OXIDANT AND APPLICATIONS THEREOF | 09/25/15 | 14/866426 | N/A | N/A |

**CANADIAN PATENTS**

| Title of Invention: | Filing Date: | Application No. | Issue Date: | Patent No: |
|---|---|---|---|---|
| METHODS OF SYNTHESIZING AN OXIDANT AND APPLICATIONS THEREOF | 7/12/01 | 2414940 | 9/21/10 | 2414940 |
| METHODS OF SYNTHESIZING AN OXIDANT AND APPLICATIONS THEREOF | 7/12/01 | 2703708 | 1/31/12 | 2703708 |
| APPARATUS FOR SYNTHESIZING AN OXIDANT | 8/11/04 | 2535697 | 3/12/13 | 2535697 |

NOTE: Any outstanding annuities due will be paid within their respective Grace Periods upon Closing.

**LICENSOR'S ADDITIONAL INTELLECTUAL PROPERTY ASSETS**
Proprietary Know-how and/or Trade Secrets relating to the production, use, and delivery of ferrate and ferrate feedstocks; and further including:
>Dry and liquid Ferrate Feedstocks, Stoichiometry, Synthesis Formulae, and methods
>Electrochemical, Catalytic, and Chemical reaction accelerators
>Reaction Kinetics and Thermal Controls
>Ferrate Product Storage, Handling, Settling, Filtering and Dosing Techniques
>Dosing Requirements at Various Flow, Pressure, Temperature, and pH ranges.
>Ferrator and related Sensor Materials, Plans, Specifications, Control Programs
>Infrastructure and Site Requirements Knowledge
>Specific Applications Knowledge and Treatment Process Expertise; including,
>Phosphorus Treatment and Removal
>Remote Monitoring and Diagnostic Techniques



# EXHIBIT B

## Transferred Contracts

**FTT's LAKE APOPKA DEMONSTRATION CONTRACT WITH GARNEY CONSTRUCTION**



## EXHIBIT C
### Equipment

FTT provides Ferrator® Treatment Systems and ancillary equipment, monitoring and diagnostics services and equipment, and specialized engineering services, as well as installation, maintenance, training and after-sale support services for its products.

**FTT Builds Systems** – Standard Ferrator models include the Fe5, Fe10, Fe50, Fe70, Fe150 and Fe300. FTT can also design and fabricate custom capacity Ferrators to meet specific project site requirements as well as a Ferrate Monitor to ensure regulatory compliance along with the Suitcase Ferrator for on-site water quality testing. Included as integral components to its systems, FTT also provides Feedstock management and provisioning solutions, which include Feedstock storage, containment, conveyance, control and monitoring equipment and components.

**FTT's Proprietary PLC's and Control Programs** – Require a customer-provided continuous 24/7 – 356 network link and provide remote monitoring and diagnostics, automated system performance, remote operator training and safeguard FTT's IP and trade secrets.

**FTT Services** – FTT also provided customer water sample testing and reports, feasibility and lifecycle cost analyses, treatment train design, component sourcing and testing, system installation and commissioning, water quality monitoring, annual calibrations, ongoing system maintenance, and on-site repairs pursuant to FTT's Standard Service Rates as appended below.

**Typical Ferrator Capacities and Specifications**

# Ferrators® For All Requirements







| FERRATOR SYSTEM | DIMENSIONS in Feet or Meters | CAPACITY in MGD or Mega liters |
|---|---|---|
| Fe5 | (2 x 3.3 x 7.3) or (0.6 x 1 x 2.2) | 3 or 11.4 |
| Fe50 | (14 x 6 x 8) or (4.2 x 1.8 x 2.4) | 12 or 45.5 |
| Fe70 | (16 x 7 x 8) or (4.8 x 2.1 x 2.4) | 14.5 or 55 |
| Fe150 | (18 X 8 X 8) or (5.5 x 2.4 x 2.4) | 32 or 121 |
| Fe300 | (44 x 8 x 11) or (13.4 x 2.4 x 3.4) | 60 or 226 |







**EXHIBIT D**

**Services Agreement**



**SERVICE AGREEMENT**

THIS SERVICE AGREEMENT ("Agreement") is made by and between Phosphorous Free Water Solutions, LLC (the "Company"), and Ferrate Treatment Technologies, LLC ("Provider") and is dated as of November 2, 2016.

WHEREAS, Company has entered into a license agreement with Provider to use Provider's technology for the removal of phosphorus from lakes and other bodies of water ("Technology"); and

WHEREAS, Provider has employees who have a deep understanding regarding the Technology and its implementation; and

WHEREAS, Provider has demonstrated the efficacy of the Technology to state and local officials in the state of Florida; and

WHEREAS, Company desires to obtain service agreements with state and local agencies to utilize the Technology for removal of phosphorus from Florida lakes ("Service Agreements"); and

WHEREAS, the ability to obtain Service Agreements will require the Company to demonstrate the efficacy and cost efficiency of the Technology on a commercial scale acceptable to state; and

WHEREAS, Provider is willing to assist and cooperate with the Company to demonstrate such efficacy and cost efficiency to obtain Service Agreements; and

WHEREAS, Provider is willing to provide additional technical support for the implementation of the Service Agreements.

NOW, THEREFORE, in consideration of the premises and the mutual promises hereinafter contained, the parties hereto agree as follows:

1.     Scope of Work.

    1.1     Provider is hereby engaged by the Company to perform services described in the whereas clauses above ("Services"). Provider also agrees to provide Services to the Company as shall be reasonably requested of or assigned to it by the Company. The Provider shall perform the requested services at the times and in the manner as may be reasonably requested by the Company and provide projected timelines for performance of the Services as requested.

    1.2     Provider will assign appropriate employees and otherwise devote such time, attention, skill and energy to the business of the Company as may be reasonably required to perform the Services. Provider warrants and represents to the Company that it has no contractual

commitments which would interfere with its ability to fully perform the Services set forth in this Agreement.

1.3     In order for Provider to perform the Services, it may be necessary for the Company to provide Provider with Confidential Information (as defined below) regarding the Company's business strategy. The Company will rely heavily upon Provider's integrity and prudent judgment to use this information only in the best interests of the Company.

1.4     In rendering Services under this Agreement, Provider shall conform to high professional standards of work and business ethics. The Company agrees to make available to Provider all documentation, materials, personnel, data and other materials ("Resources") as mutually agreed between the parties. Provider agrees to utilize such Resources solely to fulfill the Services hereunder and for no other purpose. Provider agrees not to utilize time, materials, or equipment of the Company other than to further its performance of Services hereunder or except as consented to by the Company.

1.5     Provider agrees not to use the service of any other person, entity or organization in the performance of its duties hereunder (other than employees or principals of Provider) unless it receives the prior written consent of the Company. Should the Company consent to the use by Provider of the services of any other person, entity or organization, no Confidential Information or the services to be performed under this Agreement shall be disclosed to that person, entity or organization until such person, entity or organization has executed an agreement satisfactory to the Company to protect the confidentiality of the Company's Confidential Information and the Company's absolute and complete ownership of all right, title and interest in the results of work performed under this Agreement.

1.6     While Provider is performing Services, it is an independent contractor and is not an employee, partner, or co-venturer of, or in any other service relationship with the Company. The manner in which the Services are rendered shall be within its sole control and discretion. Without limiting the foregoing, Provider is not authorized to assume or create any obligation or responsibility, express or implied, on behalf of, or in the name of, the Company or to bind the Company in any manner without the prior express written authorization from the Company.

1.7     Provider shall be solely responsible for all payroll taxes arising from compensation and other amounts paid under this Agreement for the Services, including, without limitation, state or federal income tax or for FICA taxes. Neither federal, nor state, nor local income tax, nor payroll tax of any kind, shall be withheld or paid by the Company on behalf of Provider.

1.8     Provider (or any of its employees) will not be eligible for, and shall not participate in, any social security or unemployment compensation or any employee pension, health, welfare, or other fringe benefit plan, of the Company.

DOCS-#5456373-v1

1.9     No worker's compensation insurance shall be obtained by the Company covering Provider or its employees.

2.     <u>Term and Termination</u>.     Provider's Services shall commence on the date hereof, and shall continue for six months (the "Initial Service Period"); <u>provided</u>, <u>however</u>, that Company shall have the option to renew this Services Agreement for up to three (3) additional consecutive six (6) month periods.

3.     <u>Fee</u>. Provider's compensation for Services shall consist of a fee equal to $50,000 per month for all of the Services rendered to the Company by Provider under this Agreement (the "Fee"). Company shall pay the Fee monthly in arrears on the last day of each month during the Initial Service Period. If Company elects to renew this Service Agreement then the Fee for Services rendered during the renewal period(s) shall be based on time and material using standard field services rates. Provider will invoice the Company for all such Services and will provide to the Company documentation, with such invoices, as requested by the Company to support the Fee.

4.     <u>Non-Disclosure of Confidential Information</u>.

4.1     Provider acknowledges that in the capacity as an independent contractor of the Company, Provider may have access to and acquire Confidential Information (as hereinafter defined) of the Company.   "Confidential Information" means information regarding the Company not generally known and proprietary to the Company, or to a third party for whom the Company is performing work, including, without limitation, information concerning any patents or trade secrets, confidential or secret designs, infomercial sources, media outlets, pricing, processes, formulae, source codes, plans, devices or material, research and development, proprietary software, analysis, techniques, materials or designs (whether or not patented or patentable), directly or indirectly useful in any aspect of the business of the Company or any vendor names, customer and supplier lists, databases, management systems and sales and marketing plans of the Company, or any confidential secret development or research work of the Company, or any other confidential information or proprietary aspects of the business of the Company.   All information which Provider acquires or becomes acquainted with during the period of the Services with the Company, whether developed by Provider or by others which Provider has a reasonable basis to believe to be Confidential Information, or which is treated by the Company as being Confidential Information, shall be presumed to be Confidential Information.

4.2     Except as permitted or directed by the Company, Provider shall not, either while performing Services for the Company or thereafter, divulge, furnish or make accessible to anyone or use in any way (other than in the ordinary course of the business of the Company) any Confidential Information. Provider acknowledges that the Confidential Information constitutes a unique and valuable asset of the Company and represents a substantial investment of time and expense by the Company, and that any disclosure or other use of such Confidential Information other than for the sole benefit of the Company would be wrongful and would cause irreparable

-3-

harm to the Company.  Both during and after the Initial Services Period under this Agreement, Provider will refrain from any acts or omissions that would reduce the value of such knowledge or information to the Company.

4.3.     Provider acknowledges that any breach of the covenants of this <u>Section 4</u> will result in irreparable injury to the Company for which money damages alone shall be an insufficient remedy.  Accordingly, injunctive relief without the requirement of posting a bond is an appropriate remedy for any such breach, in addition to any and all other rights and remedies for any such breach, which the Company would have at law or in equity, including the right to seek damages.

5.     <u>Rights and Data</u>.

5.1     All ideas, concepts, drawings, models, designs, formulas, methods, information, works of authorship, documents and tangible items prepared for or submitted to the Company by Provider in connection with the Services rendered under this Agreement shall belong exclusively to the Company and shall be deemed to be works made for hire (the "Deliverable Items").  To the extent that any of the Deliverable Items may not, by operation of law, be works made for hire, Provider hereby assigns to the Company the ownership of the Deliverable Items which items shall be deemed included as part of the Technology that Provider has licensed to Company under the parties' License Agreement.

5.2.     No license or right is granted to Provider, either expressly or by implication, estoppel or otherwise, to use, execute, publish, reproduce, prepare derivative works based upon, distribute copies, or publicly display the Deliverable Items either during or after providing Services.

6.     <u>Indemnification</u>.  Provider shall indemnify, defend and hold the Company and its officers, directors, members and employees (each an "Indemnitee") harmless from and against all liabilities, obligations, claims damages, penalties, causes of action, costs and expenses (including, without limitation, attorneys' fees and expenses) imposed upon, incurred by or asserted against the Indemnitee that are caused by, are attributable to, result from or arise out of (i) acts of gross negligence or willful misconduct by the Provider, (ii) the Provider's breach of any provision of this Agreement; or, (iii) the Provider's failure to meet its obligations to or perform any acts required under its agreements with any third party.  The parties shall, as soon as practicable after a claim has been made against it regarding the Services, give written notice thereof to the other along with full and complete particulars of the claim and immediately forward to the other every demand, complaint, notice, summons, pleading, or other process received by the party or its representatives.

7.     <u>Miscellaneous</u>.

7.1     <u>No Waiver</u>.  No failure on the part of Company or Provider to exercise, and no delay in exercising any right hereunder will operate as a waiver thereof, nor will any

-4-

single or partial exercise of any right hereunder by Company or Provider preclude any other or further exercise thereof or the exercise of any other right.

      7.2     <u>Severability</u>.  It is further agreed and understood by the parties hereto that if any part, term or provision of this Agreement should be held unenforceable in the jurisdiction in which either party seeks enforcement of the contract, it shall be construed as if not containing the invalid provision or provisions, and the remaining portions or provisions shall govern the rights and obligations of the parties.

      7.3     <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of Minnesota, without regard to conflicts of law provisions.

      7.4     <u>Assignment</u>.  This Agreement is personal in nature and cannot be assigned by Provider or the Company.  Notwithstanding the foregoing, the Company may assign this Agreement to any corporate parent, affiliate or subsidiary or purchaser of a majority of its units or assets.  The terms, conditions and covenants herein shall be binding upon the heirs and personal representatives of Provider, and the successors, assigns of Company and any parent, subsidiary or affiliate of Company.

      7.5     <u>Survival</u>.  Provider's obligations under <u>Sections 4, 5 and 6</u> shall survive the termination of Services and the termination or expiration of this Agreement with the Company.

      7.6     <u>Enforceability of Rights</u>.  No delay or omission by the Company to exercise any right, power, or remedy accruing to it upon any breach or default under this Agreement shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of the Company of any breach or default under this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to either of the parties, shall be cumulative and not alternative.

      7.7     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and enforceable against the parties actually executing such counterpart, and all of which, when taken together, shall constitute one instrument.

      7.8.    <u>Notice</u>.  Whenever notice is required to be given under the provisions of this Agreement, it shall be in writing and shall be deemed given when either served personally or mailed, return receipt requested, addressed to Provider at its address as set forth hereinabove and addressed to the Company at its principal office.

DOCS-#5456373-v1

EXHIBIT A

SERVICES

Provide all necessary resources for (i) the efficient transfer and transition of the Licensed Property to Company as defined in and provided for under that certain License Agreement by and between Company and Provider dated as of the date hereof and (ii) the commercial implementation and use of the Licensed Property by Company to include without limitation the following:

1.      Assist, as requested, in formulating strategies, preparing presentation materials, and arranging and actively participating in meetings with key Florida governmental agency and legislative decision makers for the purpose of obtaining Service and Revenue Contracts contemplated under the License Agreement;

2.      Deliver trial and initial permanent site evaluation support and analysis, including lab service, to confirm each site's technical and performance requirements for extraction of phosphorus;

3.      Provide technical support in the configuration and production all trial and initial permanent site equipment and infrastructure;

4.      Contribute necessary technical and service support in establishing and maintaining in operating condition equipment licensed under the License Agreement; and

5.      Technical and strategic business support, as reasonably requested, in pursuit of the business objectives of Company.

**EXHIBIT E**

**Guaranty**



## EXHIBIT F

**Promissory Note**



**EXHIBIT E**

GUARANTY OF COLLECTION

THIS GUARANTY OF COLLECTION (the "Guaranty") is made as July 28, 2016, by LUKE J. DALY (the "Guarantor") to and for the benefit of Phosphorous Free Water Solutions, LLC ("Lender").

R E C I T A L S :

A. Lender is willing to extend credit and make financial accommodations available to Ferrate Treatment Technologies, LLC ("Borrower"), in the aggregate principal amount of $2,000,000, pursuant to that Senior Promissory Note dated as of the date hereof made by Borrower in favor of Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), provided Lender receives a guaranty of collection from the Guarantor with respect to the Liabilities (as defined below).

B. The Guarantor will derive substantial economic benefit from the Note and desires to induce Lender to extend the credit to Borrower.

NOW, THEREFORE, to induce Lender from time to time, in its sole discretion, to extend or continue credit to Borrower and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor agrees with Lender as follows:

1. <u>Guaranty</u>. The Guarantor absolutely and unconditionally guarantees to Lender full and prompt collection of the obligation outstanding or arising under the Note (the "Liabilities").

2. <u>Guaranty of Collection</u>. This is a guaranty of collection only, and not a guaranty of payment. Before enforcing this Guaranty, (i) Lender first must foreclose upon any collateral securing the Note and take all commercially reasonable action to maximize the proceeds from the disposition of such collateral, and (ii) Lender must use reasonable efforts to obtain judgment against Borrower; provided, however, if Borrower becomes the debtor in any voluntary or involuntary bankruptcy case, then Lender may immediately enforce this Guaranty against Guarantor.

3. <u>Termination of Guaranty</u>. This Guaranty shall remain in effect and will not terminate until the Liabilities have been indefeasibly paid in full or otherwise satisfied in full.

4. <u>Waivers</u>. The Guarantor waives (i) notice of acceptance of this Guaranty, (ii) all presentments and protests, and (iii) notice of dishonor.

5. <u>Obligations Absolute</u>. The Guarantor's obligations are in all respects absolute and unconditional and will not be impaired, modified, released or limited by any occurrence or condition whatsoever, including, without limitation, (i) any modification, discharge, renewal or extension of the Liabilities or the Note, or any amendment, modification or stay of Lender's rights under the Note which may occur in any bankruptcy or reorganization case or proceeding concerning Borrower, whether permanent or temporary and whether or not assented to by Lender, (ii) any notice of withdrawal or revocation of this Guaranty, at any time and from time to time before, at or after maturity, (iii) any substitution or exchange, in whole or in part, of any collateral or any security held in connection with the Note, (iv) any furnishing of additional

collateral for the Note, (v) any determination that any collateral has become impaired or that any security interest taken by Lender to secure the Note is invalid or unperfected, (vi) any determination that any signatures on behalf of Borrower on the Note are not genuine or that the Note is not the legal, valid and binding obligation of Borrower, or (vii) any defenses which Borrower may have as to any sums due under the Note.

6. <u>Subordination of Borrower's Obligations to the Guarantor</u>.  Following the occurrence of any event requiring payment under this Guaranty, any payments made by Borrower to the Guarantor will be deemed to be held in trust by the Guarantor for Lender and will be paid over to Lender on account of the Liabilities without reducing or affecting in any manner the liability of the Guarantor under this Guaranty except to the extent of such payment.

7. <u>Waiver of Subrogation</u>. Until the Liabilities have been indefeasibly paid in full or otherwise satisfied in full, the Guarantor irrevocably waives, relinquishes and renounces any right of subrogation, contribution, indemnity, reimbursement or any claim whatsoever which the Guarantor may have against Borrower or any other guarantors liable on the Note arising out of, or in any way connected with, the documents evidencing, securing, guaranteeing or otherwise relating to the Note, including without limitation the Security Agreement (the "Loan Documents). The Guarantor will not assert any such claim against Borrower or any such guarantor, in any proceeding, legal or equitable, including any bankruptcy, insolvency or reorganization proceeding, before Lender is paid in full for the Liabilities, provided, however, that the Guarantor may take such actions as he or his legal counsel deem necessary or advisable to preserve any claims against the Borrower. This provision will inure to the benefit of and will be enforceable by Lender, Borrower and any such guarantors, and their successors and assigns, including any trustee in bankruptcy or debtor-in-possession. This provision will not prevent the Guarantor from asserting a claim against Borrower or any such guarantors once the Liabilities have been indefeasibly paid in full in cash to Lender.

8. <u>Security Agreement and Right of Setoff</u>. Lender will have a lien on and security interest in (and may, without demand or notice of any kind, at any time and from time to time, when any amount is due and payable by the Guarantor under this Guaranty, appropriate and apply toward the payment of such amount, in such order of application as Lender may elect) any and all balances, credits, deposits, accounts or monies of or in the name of the Guarantor now or hereafter with Lender and any and all property of every kind or description of or in the name of the Guarantor now or hereafter, for any reason or purpose whatsoever, in the possession or control of or in transit to Lender or any agent or bailee for Lender, without regard to whether Lender receives the same in pledge, for safe keeping, as agent for collection or transmission or otherwise, or whether Lender had conditionally released the same, all of which shall at all times constitute additional security for the Liabilities and the obligations of the Guarantor under this Guaranty. Lender also will have a right to setoff, at any time, without notice to the Guarantor, any and all deposits or other sums at any time or times credited by or due from Lender in any capacity to the Guarantor, when any amount is due and payable by the Guarantor under this Guaranty. Lender will be deemed to have exercised such right of setoff and to have made a charge against any deposits or obligations due from Lender immediately on occurrence of an event requiring payment under this Guaranty, even though such charge is subsequently made or entered on the books of Lender.

DOCS-#5506709-v3

9. Reinstatement of Guaranteed Liabilities. The Guarantor acknowledges and agrees that the Guarantor's obligations hereunder shall apply to and continue with respect to any amount paid to Lender on the Liabilities which is subsequently recovered from Lender for any reason whatsoever (including, without limitation, as a result of any bankruptcy, insolvency or fraudulent conveyance proceeding), notwithstanding the fact that the Liabilities may have been previously paid in full or this Guaranty terminated, or both.

10. Assignment. Lender may, from time to time, whether before or after any withdrawal or revocation of this Guaranty, without notice to the Guarantor, assign or transfer any or all of the Liabilities or any interest therein; and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such Liabilities shall be and remain Liabilities for purposes of this Guaranty, and each and every immediate and successive assignee or transferee of any of the Liabilities or of any interest therein shall, to the extent of the interest of such assignee or transferee in the Liabilities, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were Lender; provided, however, that, unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee, to enforce this Guaranty, for the benefit of Lender, as to that portion of the Liabilities which Lender has not assigned or transferred.

11. Cumulative Rights; No Waiver. Each and every right granted to Lender hereunder or under any other document delivered hereunder or in connection herewith, or allowed it by law or equity, shall be cumulative and may be exercised from time to time subject only to the limitations set forth in this Guaranty. No failure on the part of Lender to exercise, and no delay in exercising, any right shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right preclude any other or future exercise thereof or the exercise of any other right.

12. Credit Investigation. The Guarantor has not relied on any representation of Lender as to the financial condition, operation or creditworthiness of Borrower. The Guarantor further agrees that Lender shall have no duty or responsibility now or hereafter to make any investigation or appraisal of Borrower on behalf of the Guarantor or to provide the Guarantor with any credit or other information which may come to its attention now or hereafter.

13. Interpretation and Construction. Each reference herein to Lender shall be deemed to include its successors and assigns, and each reference to Borrower and the Guarantor and any pronouns referring thereto as used herein shall be construed in the singular or plural as the context may require and shall be deemed to include the heirs, executors, administrators, legal representatives, successors and assigns of Borrower and the Guarantor, all of whom shall be bound by the provisions hereof. To the extent that Borrower or the Guarantor is either a partnership or a corporation, all references herein to Borrower and to the Guarantor, respectively, shall be deemed to include any successor or successors, whether immediate or remote, to such partnership or corporation. If the Guarantor is a corporation, the Guarantor represents that each officer signing on its behalf has been duly authorized to execute this Guaranty on behalf of the corporation by its board of directors or stockholders.

14. Continuing Guaranty. This instrument is intended to be a full, complete and continuing guaranty to Lender to the extent of and for the Liabilities owing by Borrower to

3

Lender from time to time and to be valid and continuous without other or further notice to the Guarantor, notwithstanding the death, disability or dissolution of Borrower or any other guarantor, until notice in writing of withdrawal or revocation of this Guaranty, signed by the parties hereto or any of them or by the legal representative(s) of a deceased party, has actually been given to Lender, and then only as to the party or parties signing such notice and to transactions subsequent to the time of such notice; provided, however, that no such notice of withdrawal or revocation shall affect or impair any of the agreements and obligations of the Guarantor hereunder with respect to any and all Liabilities existing at the time of actual receipt of such notice by Lender until paid in full; and shall not affect or impair Lender's right to recover all expenses paid or incurred by Lender endeavoring to enforce this Guaranty against the Guarantor. All of the agreements and obligations of the Guarantor under this Guaranty shall, notwithstanding any such notice of withdrawal, remain in effect until all such Liabilities and all such expenses shall have been paid in full.

15. <u>Subsequent Guaranties</u>. No subsequent guaranty by the Guarantor or any other person of the Liabilities shall be deemed to be in lieu of or to supersede this Guaranty, unless otherwise expressly provided therein. The obligation under this Guaranty shall be in addition to any obligation of the Guarantor as endorser of any obligations of Borrower.

16. <u>Jurisdiction and Venue</u>. The Guarantor irrevocably submits to the jurisdiction and venue of the United States Federal Courts located in Minneapolis, Minnesota, in any suit, action or proceeding arising out of or relating to this Guaranty. The Guarantor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Guarantor agrees that a final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on the Guarantor.

17. <u>Entire Agreement</u>. This writing represents the entire agreement of the parties and is intended as a complete and exclusive statement of the terms of this Guaranty. No amendment or modification shall be effective unless made in writing and signed by the parties. No course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be used to supplement, amend or modify the terms hereof.

18. <u>Governing Law</u>. This Guaranty shall be performed, governed by and construed in accordance with the laws of the State of Minnesota. If any provision of this Guaranty shall be held invalid by any court of competent jurisdiction, such holding shall not invalidate any other provision hereof.

19. <u>Costs</u>.  The undersigned will pay or reimburse the Lender for all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender in connection with the protection, defense or enforcement of this guaranty in any litigation or bankruptcy or insolvency proceedings.

[Signature page follows]

4

In Witness Whereof, the undersigned has executed this Guaranty as of the date first set above.

_____
Luke J. Daly

6

**EXHIBIT F**
**SENIOR PROMISSORY NOTE**

$2,000,000.00                                                                                July 28, 2016

For value received, Ferrate Treatment Technologies, LLC, a Delaware limited liability company ("***Maker***"), hereby promises to pay to the order of Phosphorous Free Water Solutions, LLC or its assigns (the "***Holder***"), upon the earlier of (i) July 31st, 2018 ("***Maturity***"), or (ii) an Event of Default (as defined below), the principal amount of $2,000,000.00, or such amount advanced or outstanding hereunder, plus interest in arrears from and including the date hereof on the principal balance from time to time outstanding, at a rate per annum equal to five percent (5%). This Senior Promissory Note (this "***Note***") may be prepaid in whole or in part. This Note shall be senior to all other debt of the Maker with the exception of permitted secured debt in the approximate amount of $263,000 owing to Greg Potter, Kevin Potter and Mike Schwitz (the "Existing Debt"). Interest shall be calculated on the basis of actual number of days elapsed over a year of 365 days. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Maker shall not be required to pay, any interest or other fees or charges in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Maker or credited to reduce the principal hereunder. All payments received by the Holder will be applied first to costs of collection, if any, then to interest and the balance to principal.

Unless otherwise extended or renewed by Holder at its election, if not paid in cash, all outstanding principal owing under this Note will be paid to Holder by offsetting amounts due from Holder to Maker under that certain License Agreement between Holder and Maker attached hereto as Exhibit A and any outstanding accrued interest thereon shall be forgiven. Notwithstanding the foregoing, Holder may provide Maker with notice that it will not extend the term of this Note beyond July 31, 2018 if (a) Holder provides such notice to Maker on or before April 1, 2018; and (b) the Holder determines in its reasonable discretion that Holder's projected payments under the License Agreement during the three year period beginning July 31, 2018 shall not be sufficient to provide for the payment of the amounts then owing under this Note. This Note shall be secured by a lien on all assets, including intellectual property, of Maker subject only to prior lien(s) for indebtedness totaling approximately $263,000 as of the date of this Note. This Note shall be further secured by the guarantee of Luke J. Daly.

Except as otherwise provided herein, payments of principal and interest will be made by check in immediately available funds or by wire transfer sent to the Holder at the address furnished to Maker for that purpose.

1. <u>Events of Default</u>. The outstanding principal and accrued interest on this Note shall, at the option of the Holder hereof, become due and payable without notice or demand, upon the occurrence of any one of the following specified events (each event referred to as "Event of Default"):

(a) failure to pay any amount when due as herein set forth, or any other document or instrument executed and delivered in connection herewith or therewith (collectively, the "Loan Documents");

(b) default in the performance by Maker or Guarantor of any material obligation to the Holder under this Note or any other Loan Document, which default is not cured within thirty (30) days after written notice of such default from the Holder;

(c) the making by Maker or Guarantor of a general assignment for the benefit of creditors;

(d) the filing of any petition or the commencement of any proceeding by Maker or Guarantor for any relief under any bankruptcy or insolvency laws;

(e) the filing of any petition or the commencement of any proceeding against Maker or Guarantor for any relief under any bankruptcy or insolvency laws, which proceeding is not dismissed within sixty (60) days; or

(f) the past or future making of a materially false representation or warranty by Maker or Guarantor in connection with this Note or the Loan Documents.

Notwithstanding anything to the contrary contained in this Section 1, an occurrence of an event described in clauses (c), (d) or (e) above shall automatically and immediately constitute an Event of Default hereunder without any further action or notice by Holder.

2. <u>Default Interest Rate</u>.  The default interest rate shall be 15% per annum.

3. <u>Expenses of Collection</u>.  Maker agrees to pay the Holder's costs in collecting and enforcing this Note or any other Loan Document, including attorney's fees.

4. <u>Waiver by the Holder</u>.  No waiver of any obligation of Maker under this Note shall be effective unless it is in a writing signed by the Holder.  A waiver by the Holder of any right or remedy under this Note on any occasion shall not be a bar to exercise of the same right or remedy on any subsequent occasion or of any other right or remedy at any time.

5. <u>Notice</u>.  Any notice required or permitted under this Note shall be in writing and shall be deemed to have been given on the date of delivery, if personally delivered to the party to whom notice is to be given, including by email with proof of receipt, or on the fifth business day after mailing, if mailed to the party to whom notice is to be given, by certified mail, return receipt requested, postage prepaid, or overnight courier service with proof of receipt, and addressed as follows:

If to the Maker:                     Ferrate Treatment Technologies, LLC
440 Sunport Lane, Suite 550
Orlando, Florida 32809
Attn: Luke Daly, President
Email: ceo@ferrate.biz

If to the Holder:                    Phosphorous Free Water Solutions, LLC.
80 South 8th Street
Minneapolis, Minnesota 55402
Attn: Tim McIntee
Email: tmcintee@alchemistgroup.net

6. <u>Waiver by Maker</u>. Maker hereby expressly waives presentment, demand and protest, notice of demand, dishonor and nonpayment of this Note, and all other notices or demands of any kind in connection with the delivery, acceptance, performance, default or enforcement hereof, and hereby consents to any delays, extensions of time, renewals, waivers or modifications that may be granted or consented to by the Holder hereof with respect to the time of payment or any other provision hereof.

7. <u>Severability</u>. In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Note operate or would prospectively operate to invalidate this Note, then and in any such event, such provision(s) only shall be deemed null and void and shall not affect any other provision of this Note and the remaining provisions of this Note shall remain operative and in full force and effect and in no way shall be affected, prejudiced, or disturbed thereby.

8. <u>Governing Law</u>. This Note will be construed and enforced in accordance with the law of the State of Minnesota, without regard to its conflict of law provisions.

9. <u>Time of the Essence</u>. Time is of the essence with respect to this Note and each and every provision hereof.

10. <u>Binding Nature</u>. The provisions of this Note shall be binding upon Maker and the successors and permitted assigns of Maker, and shall inure to the benefit of the Holder and any assignee of all or any portion of this Note, and Holder's respective successors and assigns.

11. <u>Use of Proceeds</u>. The proceeds of this Note shall be used as set forth on <u>Exhibit B</u> attached hereto. Maker shall provide written evidence of payments to CPA Global Limited for all outstanding and due balances.   Luke Daly shall individually receive no more than $180,000 of the proceeds of the loan.

12. <u>Amendments, Prior Documents</u>.   No amendment, modification, change, waiver, release or discharge hereof and hereunder shall be effective unless evidenced by an instrument in writing and signed by the party against whom enforcement is sought. This Note shall replace any prior Notes issued and signed in connection with financial accommodations between the parties.

- 3 -

[*Signature Page Follows*]

DOCS-#5407828-v6

**FERRATE TREATMENT TECHNOLOGIES, LLC**

_____

By: Luke Daly
Title: President.

_[Signature Page to the FFT Promissory Note for Financing]_

- 5 -

**Exhibit A**

**License Agreement**

**Exhibit B**

**<u>Sources and Uses</u>**

## EXHIBIT G

## Qualified Water Treatment Facilities

1. **Primary Purpose of Phosphorous Removal at Qualified Water Treatment Facilities**. The steps for determining the primary purpose with respect to a Qualified Water Treatment Facility project are as follows:

   a. **Step One-** The party, PFWS (Licensee) or FTT (Licensor), who receives an inquiry from a water treatment facility makes a preliminary determination if Phosphorous removal is the or one of the Facility's treatment objectives. If the answer is **NO** and does not involve Phosphorous removal, PFWS has no further interest or license right to continue forward. It becomes an exclusive FTT opportunity regardless of who came upon it.

   b. **Step Two.** If the answer is **YES** and one of the Facility's objectives is the removal of Phosphorous, then a determination is to be made as to whether it is the Primary Purpose or not.

      i. The Party making the contact with the Facility would inform the other and exchange all relevant information to the question of Primary Purpose and the Parties will make a good faith effort to resolve the question by mutual agreement. If the Parties agree Phosphorous is **NOT** the Primary Purpose PFWS promptly withdraws from the engagement if it is the contacting party and transfers the opportunity to FTT . If FTT is the contacting party FTT proceeds to conclude the opportunity without further engagement of PFWS.

      ii. If the Parties are unable to agree among themselves, the question of Primary Purpose is put to a pre-agreed third party who will be a single individual from the industry. She will make the decision within 48 hours of receiving all information she deems necessary to make the determination. If she determines it is NOT the primary purpose, the parties proceed as above in (i).

      iii. If either the Parties determine by mutual agreement or it is decided by the neutral third party that Phosphorous removal is the Primary Purpose then the Parties proceed to Step Three.

   c. **Step Three.** A determination has been made Phosphorous removal is the Primary Purpose for the opportunity at the Qualified Water Treatment Facility. The opportunity now falls within the grant of exclusive license rights to PFWS.

      i. The Parties determine who should take the lead in further communication with the Qualified Water Treatment Facility. PFWS will hold final decision rights as to this question.

      ii. The Party who takes the lead in pitching the opportunity will use its best efforts to structure the transaction in the form of a reoccurring revenue model. If the transaction is ultimately structured as a reoccurring revenue model, PFWS will be obligated to pay pursuant to its license 6% of all gross revenues to FTT in accordance with Section 1.2(a) of the Agreement.

      iii. If the transaction is ultimately structured as a capital equipment sale, the party who initiated the contact with the Qualified Water Treatment Facility will receive 60% of all Net Project Margin and the other party will receive 40% of Net Project Margin in accordance with Section 1.2(b) of the Agreement.

      iv. There will be a life cycle on all sales leads of 12 months from initial contact to execution of the contract. After this period the opportunity becomes a 50/50 split of the Net Project Margin.

